United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 95-4207
_____

James M. Dickey,                        *
                                        *
        Appellee,                       *
                                        *   Appeal from the United States
        v.         *                    District Court for the Eastern
                                        *   District of Missouri.
Royal Banks of Missouri, a              *
Missouri State Banking                  *
Corporation, and Laura                  *
Trigg-Brown, an Individual,             *
                                        *
        Appellants.                     *


                                _____

                Submitted:  November 22, 1996

                Filed: April 15, 1997
                                _____

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE,[1]
        District Judge.
                                _____

MORRIS SHEPPARD ARNOLD, Circuit Judge.


        A jury awarded James M. Dickey $104,000 against Royal Banks of
Missouri (the "Bank") for unjust enrichment and against the Bank and its
employee, Laurie Trigg-Brown, for misconduct associated with an improper
notarization.  We have concluded that under Missouri law the unjust
enrichment claim failed to state a cause of action, and that the second
claim failed for lack of evidence on the issue of causation.  We therefore
reverse the judgment of the trial court.


_____

        [1]The Honorable Andrew W. Bogue, United States District Judge
for the District of South Dakota, sitting by designation.

I.

This case arises from the actions of Barney Sandow, who was originally a defendant in the case but was later dismissed. He is currently serving time in prison for perpetrating various frauds on Mr. Dickey as well as on others. See United States v. Sandow, 78 F.3d 388 (8th Cir. 1996). The two men met in 1987 in Saint Louis County, Missouri, where they were commercial tenants in the same building. Mr. Sandow had an insurance business and Mr. Dickey had an equipment supply business. They developed a friendship. Mr. Sandow handled a series of small business affairs for Mr. Dickey, and in time Mr. Dickey came to trust him completely.

When Mr. Sandow suggested that an annuity that Mr. Dickey owned could be exchanged for a better-performing asset, Mr. Dickey went along with the idea and delivered the annuity to him. While at first Mr. Dickey believed that his annuity was going to be cashed in for a higher-yielding one, at a later time he understood from his conversations with Mr. Sandow that the annuity was to be used as collateral for a loan to secure money for reinvestment. The vagueness of his understanding on this matter, and the casualness with which he lost control of his annuity, are testaments to Mr. Dickey's faith in Mr. Sandow. That faith also led him to sign any paper that Mr. Sandow put in front of him, which came to include, in time, an assignment and pledge of Mr. Dickey's annuity to the Bank.

Mr. Sandow went to the Bank to apply for a loan. He told the Bank that Mr. Dickey was his co-investor and that the two of them were going to lend the proceeds of the loan to a third party for a higher rate of interest. He delivered Mr. Dickey's annuity to the Bank as collateral. When the Bank considered the loan at a meeting of the loan committee it was approved, although a director of the

Bank who was present at the meeting (who knew Mr. Dickey as a former neighbor) asked that the loan officer verify that Mr. Dickey was aware of the circumstances concerning his annuity. Mr. Sandow subsequently delivered an assignment of the annuity, signed by Mr. Dickey, to the Bank.

The loan officer then called Mr. Dickey to verify that he knew what was happening. The officer testified that he asked Mr. Dickey whether he understood that an annuity put up as collateral could be lost in the event that the loan went bad. Mr. Dickey testified that he told the officer that he understood "from Mr. Sandow that he [had] in mind an investment that he might put the annuity on as collateral for somebody to buy this condo."

After that conversation, the officer instructed Ms. Trigg-Brown to notarize the assignment even though Mr. Dickey did not appear in person. The assignment was then sent to the issuer of the annuity, the John Alden Company. That company sent a letter to the Bank, with a copy to Mr. Dickey, acknowledging receipt of the assignment. The Bank prepared a pledge of the annuity, which Mr. Sandow returned with Mr. Dickey's signature. Mr. Sandow then signed a promissory note and the Bank issued a check to him in October, 1990.

Mr. Sandow did not simply take the money and run. In late October he gave Mr. Dickey a check for $5,000, which he called "up front interest." Mr. Dickey accepted the check, testifying later that he "didn't know what he was talking about, 'up front interest,' but he said that's the way they do business on collateral, so I took his word for it." Mr. Sandow also told Mr. Dickey that more money would follow, but none ever came.

By May, 1991, the Sandow loan had gone into default.  The Bank requested the cash value of the annuity from the John Alden Company and a check for $110,318.46 was sent payable to "Royal Banks of Missouri, Inc., FBO/[loan number] James Dickey."  This check, which was sent to Mr. Sandow's home address, was then presented by Mr. Sandow to the Bank with Mr. Dickey's endorsement on it.  Finally, the Bank, in August, 1991, issued a check payable to Mr. Sandow and Mr. Dickey for $6,556.43, representing the difference between the amount owed the Bank and the value of the collateral.  Mr. Sandow apparently cashed that check after forging Mr. Dickey's endorsement.

## II.

The unjust enrichment claim in this case was tried as a common-law claim for money had and received.  This is a vestigial form but it is not so archaic that it can be ignored under Missouri law.  It is a particular instance of general assumpsit or, in more modern terms, quasi-contract, and it encompasses a number of factual patterns which call for restitution to prevent unjust enrichment. It and other such ancient common counts, such as quantum meruit and for money paid, continue to serve a purpose in Missouri law since "the principle of unjust enrichment, isolated and alone, without its formal pleading baggage, may not state a substantive claim for relief." Fenberg v. Goggin, 800 S.W.2d 132, 135 (Mo. Ct. App. 1990). See also 1 Dan B. Dobbs, Law of Remedies § 4.2 at 570-86 (2d ed. 1993).

We recognize, as Mr. Dickey urges us to do, the breadth of this common-law action under Missouri law.  The action for money had and received is "a very broad and flexible action," and "[t]he tendency of the courts is to widen rather than restrict its scope." Alarcon v. Dickerson, 719 S.W.2d 458, 461 (Mo. Ct. App. 1986).  We

-4-

also note the way in which law and equity have become combined in unjust enrichment actions, so that "[t]hey are equitable in character, the obligation arising from the law and natural justice." Donovan v. Kansas City, 175 S.W.2d 874, 884 (Mo. 1943) (en banc), modified on other grounds, 179 S.W.2d 108 (Mo. 1944) (en banc) (per curiam). Nevertheless, although it is broad and appeals to a court's sense of equity and common right, an action for money had and received must, to be successful, fall within limits that have over the years become reasonably well demarcated.

An action for money had and received will lie when the defendant received money from or for the plaintiff that belongs in good conscience to the plaintiff. For instance, if the plaintiff paid money to the defendant by mistake, see, e.g., Brandkamp v. Chapin, 473 S.W.2d 786, 788 (Mo. Ct. App. 1971), or under duress, see, e.g., Jurgensmeyer v. Boone Hospital Center, 727 S.W.2d 441, 443 (Mo. Ct. App. 1987), or by reason of fraud, see, e.g., Teachers Credit Union v. Olds, 553 S.W.2d 545, 547 (Mo. Ct. App. 1977), a claim for money had and received is made out. Fenberg, 800 S.W.2d at 135. See also 1 Dobbs, Law of Remedies § 4.2(3) at 576-86. Such an action also lies if it appears "'that the money in question belonged to [the] plaintiff, [and] that it was secured by [the] defendant without [the] plaintiff's consent, and without giving any valid consideration.'" Forsthove v. Hardware Dealers Mutual Fire Ins. Co., 416 S.W.2d 208, 220 (Mo. Ct. App. 1967), quoting 58 C.J.S. Money Received § 8 at 919 (1948). One reading of these cases is that a court will force a defendant to disgorge a windfall if it is equitable to do so. See 1 Dobbs, Law of Remedies § 4.1(1) at 555 ("[r]estitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain"). See also Newco Land Co. v. Martin, 213 S.W.2d 504, 515 (Mo. 1948).

The difficulties in fitting this theory of relief to the facts of this case are so numerous, we believe, as to have made the legal theory upon which relief was sought and granted practically incoherent. The trial court instructed the jury that a case for money had and received would be made out if the "plaintiff's intended purpose in assigning the aforesaid insurance policy and annuity differed from the purpose for which defendant ... accepted and applied the policy and annuity," and if "in accepting and applying the proceeds of the aforesaid insurance policy and annuity, defendant ... knew facts upon which a reasonable person would suspect that the intended purpose of plaintiff in assigning the insurance policy and annuity ... was different from the purpose for which defendant ... applied the proceeds."

With respect, we fail to understand how these facts, if proved, could give rise to a claim for money had and received in Missouri or, indeed, anywhere else. First of all, no money changed hands at the time that the instruction marks as critical, that is, when the assignment took place. Second, assuming, _arguendo_, that the action could lie so long as something of value (but not necessarily money) was transferred, the transfer of the annuity did not amount to a windfall to the Bank. The Bank lent Mr. Sandow money in reliance on the assignment, and the money that it received in the end was applied to satisfy that unpaid loan. Third, this transfer of money to the Bank cannot be called unjust in light of the fact that it merely satisfied a debt that was concededly owed. Finally, it is not easy to understand how the transfer of the money to the Bank could be unjust when the jury instruction speaks of what the Bank knew or should have known at some time considerably anterior to the transfer, that is, when the assignment was made. Mr. Dickey, moreover, received consideration for his assignment, namely, Mr. Sandow's promise to make an investment for him that he

hoped would be superior in performance to his annuity, and the $5,000 he accepted from Mr. Sandow at a later time which he understood to be a benefit of the investment decision that he had made.

We note, in addition, that the facts recited in the quoted instruction also do not make out a case of negligence. While the instruction speaks in terms of what the defendant knew or should have known, language that is at home in negligence cases, in this instance there is no connection made between the allegedly relevant knowledge and the loss. There is nothing in the instruction that would allow a recovery for negligently accepting an assignment, for the jury is invited to discern what knowledge the Bank might have had at a time considerably later than the date that the assignment was executed. By that time, the Bank had already advanced money to Mr. Sandow, and anything that it learned later would have manifestly come too late to undo a transaction long since consummated. It can scarcely be maintained that the Bank acted negligently in applying the proceeds of the assignment to the debt after that debt came into default.

### III.

The jury also awarded relief in this case based on a Missouri statute that makes a notary, and his or her employer, responsible for damages that are proximately caused by professional misconduct. See Mo. Rev. Stat. §§ 486.355-486.365. The theory of this count would appear to rest on the premise that Mr. Sandow's fraudulent scheme would have been uncovered if only Mr. Dickey had appeared before a notary when he executed the assignment.

There is more than one difficulty in the way of this theory, not least the fact that Mr. Dickey admits that the signature on the

assignment is his. This admission removes the notary from any responsibility for the execution of the assignment and the harm that befell Mr. Dickey, because "the notary's duty is [merely] to acknowledge the authenticity of the signature." Herrero v. Cummins Mid-America, Inc., 930 S.W.2d 18, 22 (Mo. Ct. App. 1996). The court in Herrero, rejecting the claim that the role of the notary was to make sure that the signatory knew what he was signing, said that "[b]ecause the plaintiff here did not dispute the genuineness of her signature, [the defendant] did not commit official misconduct, which would subject her to liability for notarizing the form outside of [the] plaintiff's presence." Id.

Not surprisingly, Mr. Dickey offers no case in which a notary was held liable in a situation where the notarization was technically deficient but the signature was authentic. We note, moreover, that Mr. Dickey's claim is yet one step further removed from the one rejected in Herrero: He claims not that he was mistaken about the contents of the assignment form, but only that he was mistaken about the underlying purpose for which he was assigning his annuity. Neither Ms. Trigg-Brown, nor Royal Banks, can be found liable in these circumstances.

IV.

For the reasons stated, we reverse the judgment of the trial court.


A true copy.

    Attest:


        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-